**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| **JAMES R. HALE,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) Civil Action No.   3:24cv339 |
| | ) |
| **EQUIFAX INFORMATION SERVICES, LLC,** | ) |
| SERVE:  Corporation Service Company, Reg. Agent | ) |
| 100 Shockoe Slip | ) |
| 2nd Floor | ) |
| Richmond, VA  23219 | ) |
| | ) |
| **EXPERIAN INFORMATION SOLUTIONS, INC.,** | ) |
| SERVE:  CT Corporation System, Reg. Agent | ) |
| 4701 Cox Rd, | ) |
| Ste. 285 | ) |
| Glen Allen, VA 23060 | ) |
| | ) |
| **and** | ) |
| | ) |
| **TRANS UNION, LLC,** | ) |
| SERVE:  Corporation Service Company, Reg. Agent | ) |
| 100 Shockoe Slip | ) |
| 2nd Floor | ) |
| Richmond, VA 23219 | ) |
| | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW the Plaintiff, **JAMES R. HALE** ("Mr. Hale" or "Plaintiff"), by and through the undersigned Counsel, and alleges the following against Defendants, **EQUIFAX INFORMATION SERVICES, LLC** ("Equifax"), **EXPERIAN INFORMATION SOLUTIONS, INC.** ("Experian"), and **TRANS UNION, LLC** ("Trans Union"). Plaintiff alleges as follows:

## PRELIMINARY STATEMENT

1.      This is an action for actual and punitive damages, costs, and attorneys' fees brought to enforce and protect the civil rights of the Plaintiff afforded and enacted by the Fair Credit Reporting Act, 15 U.S.C. §§ 1681–1681x ("FCRA").

2.      The Fair Credit Reporting Act provides federally codified protection of Plaintiff's civil rights with regard to Plaintiff's privacy, Plaintiff's reputation, and Plaintiff's due process rights against defamation. The Fair Credit Reporting Act is part of a larger category of consumer protection statutes designed to arm consumers against discrimination, intrusions upon privacy, and other types of unfair and inequitable treatment. Similar statutes falling under this same umbrella of protection include, for example, the Equal Credit Opportunity Act, the Fair Housing Act, and the Fair Debt Collection Practices Act.

3.      Claims under these federal protections are brought "in connection with any action involving a claim of 'unlawful discrimination'", as described in 26 U.S.C § 62(a)(20). For the purposes of 26 U.S.C § 62(a)(20), the term "unlawful discrimination" is broadly defined in 26 U.S.C § 62(e) to mean "an act that is unlawful under . . .[a]ny provision of Federal, State, or local law, or common law claims permitted under Federal, State, or local law . . . providing for the enforcement of civil rights".

4.      Today in America there are three major consumer reporting agencies ("CRAs"), Defendants Trans Union, LLC, Equifax Information Services, LLC and Experian Information Solutions, Inc.

5.      The FCRA demands that CRAs utilize reasonable procedures to assure the maximum possible accuracy of the information they report. 15 U.S.C. § 1681e(b). When a

consumer disputes an item of information, the agency must investigate the dispute and, if the information cannot be verified, delete it. 15 U.S.C. § 1681i.

6.      This requirement of reasonable procedures designed to ensure the maximum possible accuracy of information that CRAs report is meaningful, and no mere formality. It is not enough for CRAs to simply parrot information they receive from a lender, particularly when a consumer makes a dispute about information reported.

7.      When a consumer disputes information through the CRAs, those disputes are transmitted to the party furnishing the information, in this matter, two creditors who were excluded from Plaintiff's bankruptcy discharge. The FCRA demands that each party separately conduct a reasonable investigation of the consumer's dispute and correct or delete information they learn to be inaccurate or cannot otherwise verify.

8.      Plaintiff brings claims under Section 1681e(b) against CRAs Equifax, Experian, and Trans Union because each reported inaccurate information about at least one account that was excluded from his chapter 13 bankruptcy discharge. When Plaintiff disputed these inaccuracies, Equifax, Experian, and Trans Union also violated 1681i by failing to conduct reasonable investigations of the information they were reporting in Plaintiff's credit files regarding those accounts.

9.      The Consumer Financial Protection Bureau has noted, "experience indicates that [CRAs] lack incentives and under-invest in accuracy" Consumer Fin. Prot. Bureau, Supervisory Highlights Consumer Reporting Special Edition 21 (Issue 14, March 2, 2017). This is particularly true as to how these Defendants have complied—or failed to comply—with their now 50-year-old obligation to conduct meaningful accuracy investigations.

10.     Equifax, Experian, and Trans Union have been repeatedly sued by consumers, sanctioned by regulators, and reprimanded by both District and Appellate courts due to their automated parroting of whatever their customer-creditors instruct. Had Equifax, Experian, and Trans Union followed the CFPB's advice and heeded the many warnings of courts and regulators alike, Plaintiff would not have been harmed.

## JURISDICTION AND VENUE

11.     The jurisdiction for this Court is conferred by 15 U.S.C. § 1681p and 28 § U.S.C. 1331.

12.     Venue is proper because a substantial part of the events giving rise to the claims occurred in this District and Division, and Equifax, Experian, and Trans Union regularly transact business within this District.

## PARTIES

13.     The Plaintiff is a natural person and a "consumer" as defined by 15 U.S.C. § 1681a(c). Plaintiff is a resident of this District and Division.

14.     Equifax is a limited liability company, authorized to do business in the Commonwealth of Virginia through its registered agent in Richmond, Virginia.

15.     Equifax is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f), (a "CRA"). Equifax is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

16.     Equifax disburses consumer reports to third parties under contract for monetary compensation.

17.     Experian is a corporation authorized to do business in the Commonwealth of Virginia through its registered agent located in Glen Allen, Virginia.

18.     Experian is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f) (a "CRA")., Experian is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

19.      Experian disburses consumer reports to third parties under contract for monetary compensation.

20.     Trans Union is a limited liability company, authorized to do business in the Commonwealth of Virginia through its registered agent located in Richmond, Virginia.

21.     Trans Union is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f) (a "CRA"). Trans Union is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

22.     Trans Union disburses consumer reports to third parties under contract for monetary compensation.

## FACTUAL ALLEGATIONS

### Sections 1681e(b) and 1681i(a) of the Fair Credit Reporting Act Require Substantive Investigations and Prohibit Mere "Parroting" of the Defendants' Creditor-Customers

23.     "Congress enacted FCRA in 1970 out of concerns about abuses in the consumer reporting industry. *See* S. Rep. No. 91-517, at 3 (1969); 116 Cong. Rec. 35941 (1970) (statement of Sen. Proxmire); *id.* at 36570 (statement of Rep. Sullivan); "In enacting FCRA Congress adopted a variety of measures designed to ensure that agencies report accurate information." *Dalton v.*

*Capital Associated Indus., Inc.*, 257 F.3d 409, 414–15 (4th Cir. 2001). "In recognition of the critical role that CRAs play in the credit markets and the serious consequences borne by consumers because of inaccurate information disseminated in consumer credit reports prepared by CRAs, Congress placed on a CRA what can only be described as very high legal duties of care, set forth . . . in 15 U.S.C. §§ 1681e(b), 1681i(a)(1)(A), and 1681i(a)(3)(A)." *Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

24.     "Section 1681e(b) sets forth the CRAs' overall du[t]y:

(b) Accuracy of report. Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

*Burke,* 2011 WL 1085874, at *4.

25.     "The . . . FCRA . . . was crafted to protect consumers from the transmission of inaccurate information about them, and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and responsible manner." *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995) (citations omitted). "'These consumer oriented objectives support a liberal construction of the FCRA,' and any interpretation of this remedial statute must reflect those objectives." *Cortez v. Trans Union, LLC*, 617 F.3d 688, 706 (3d Cir. 2010) (quoting *Guimond*, 45 F.3d at 1333).

26.     Section 1681i(a) on the other hand requires much more from a CRA after a consumer has placed it on notice of an inaccuracy through the consumer's dispute:

[I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly . . . of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file . . . before the end of the 30-day period[.]

15 U.S.C.A. § 1681i(a)(1)(A).

27.     Section § 1681i(a) imposes "a duty . . . to make reasonable efforts to investigate and correct inaccurate or incomplete information brought to its attention by the consumer." *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 (11th Cir. 1991). "[T]he term 'investigation' is defined as '[a] detailed inquiry or systematic examination' or 'a searching inquiry.'" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016) (citations omitted).

28.     It has long been the law that a CRA, such as Equifax, Experian, and Trans Union, does not fulfill its "grave responsibility" to conduct a reinvestigation of a consumer's dispute by merely contacting the creditor who supplied the dispute item. *See, e.g.*, *Pinner v. Schmidt,* 805 F.2d 1258, 1262 (5th Cir.1986) (concluding it was unreasonable for a credit reporting agency to contact only the creditor in its reinvestigation of a disputed debt); *Collins v. Experian Info. Sols., Inc.*, 775 F.3d 1330, 1333 (11th Cir.), *on reh'g sub nom. Collins v. Equable Ascent Fin., LLC*, 781 F.3d 1270 (11th Cir. 2015); *Carlisle v. Nat'l Commercial Servs., Inc.*, No. 1:14-CV-515-TWT-LTW, 2016 WL 4544368, at *9 (N.D. Ga. July 22, 2016), *report & recommendation adopted,* No. 1:14-cv-515-TWT, 2016 WL 4532219 (N.D. Ga. Aug. 29, 2016) ("[A] reasonable factfinder could find that merely contacting [the creditor] was not sufficient to determine whether the disputed information was inaccurate.")

29.     That "grave responsibility" imposed by the FCRA reinvestigation requirement "must consist of something more than merely parroting information received from other sources." *Cushman v. Trans Union Corp.,* 115 F.3d 220, 225 (3d Cir.1997).     Accordingly,    "a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute." *Id.* The *Cushman* court held that Trans Union's

reading of Section 1681i(a) to require only parroting "would require it only to replicate the effort it must undertake in order to comply with § 1681e(b)[,] render[ing] the two sections largely duplicative of each other." *Id.*

30.    As the Fourth Circuit explained in *Johnson v. MBNA*:

> The key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination." Am. Heritage Dictionary 920 (4th ed.2000); see Webster's Third New Int'l Dictionary 1189 (1981) (defining "investigation" as "a searching inquiry").

31.    Further, as the Defendants are aware, the Eastern District of Virginia has held that even though the term "investigation" is not used in § 1681e(b), it is clear that Defendants have a duty to conduct a reasonable initial investigation pursuant to § 1681e(b) as well as § 1681i(a) and that this is "central" to the CRAs' duties of care under that portion of the Act:

> This conclusion flows from the plain meaning of both [§ 1681e(b) and § 1681i(a)]. For example, Section 1681e(b) requires (1) "reasonable procedures" that (2) "assure" (3) "maximum possible accuracy." To "assure" means "to make sure or certain: put beyond all doubt." *Webster's Third New International Dictionary* 133 (1993). "Maximum" means the "greatest in quantity or highest degree attainable" and "possible" means something "falling within the bounds of what may be done, occur or be conceived . . . ." *Id.* at 1396, 1771. It is difficult to imagine how "maximum possible accuracy" could be guaranteed without an adequate investigation. Likewise, Section 1681i(a)(1)(A) requires a "reinvestigation," necessarily implying that an "investigation" was required to have been performed in the first instance.

*Burke*, 2011 WL 1085874, at *4.

32.    Today, furnishers have their own independent duties under the FCRA—principally those found at 15 U.S.C. §1681s-2—which Congress first imposed almost 30 years ago. THE CONSUMER CREDIT REPORTING REFORM ACT OF 1996, Pub. L. No. 104-208 (1996).

### Background Information

33.    On May 1, 2018, Plaintiff filed a petition for a chapter 13 reorganization bankruptcy in the Eastern District of Virginia, Richmond Division.

34.    On May 3, 2018, Plaintiff filed a chapter 13 repayment plan (the "Plan").

35.    The Plan provided that Plaintiff would make direct payments to Pentagon Federal Credit Union, pursuant to 11 U.S.C. § 1322(b)(5), for the loan secured by Plaintiff's 2017 Ford Explorer (the "Pentagon FCU Loan").

36.    The Plan also provided that Plaintiff would make direct payments to SunTrust Mortgage, pursuant to 11 U.S.C. § 1322(b)(5), for the mortgage secured by Plaintiff's home in Midlothian, Virginia (the "SunTrust Mortgage").

37.    No party filed an objection to the Plan, and the bankruptcy court entered an order confirming the Plan on June 22, 2018.

38.    Plaintiff completed the terms of the Plan.

39.    The bankruptcy court granted a discharge in Plaintiff's case on September 21, 2022.

40.    Because Plaintiff's plan provided for the Pentagon FCU Loan and the SunTrust Mortgage to be paid pursuant to 11 U.S.C. § 1322(b)(5), the Pentagon FCU Loan and the SunTrust Mortgage were specifically excluded from Plaintiff's bankruptcy discharge under 11 U.S.C. 1328(a)(1).

### *The Industry Standard for Accounts Provided for under 11 U.S.C. § 1322(b)(5)*

41.    The Consumer Data Industry Association (the "CDIA") describes itself as "the voice of the consumer reporting industry, representing consumer reporting agencies including the nationwide credit bureaus, regional and specialized credit bureaus, background check companies, and others."[1]

---

[1] Homepage – CDIA, https://www.cdiaonline.org/.

42.     Equifax, Experian, and Trans Union are prominent and longstanding members of the CDIA.

43.     The CDIA created the Credit Reporting Resource Guide (the "CRRG") to serve as the industry standard for how consumer information should be reported in various situations.

44.     One of the situations covered under the CRRG is how consumer information should be reported after bankruptcy.

45.     According to the CRRG, when a consumer completes their chapter 13 bankruptcy plan and the "consumer continues to make payments (example: mortgage account)" the "consumer information indicator" indicating that the account is impacted by bankruptcy should be removed. *Credit Reporting Resource Guide*, 6-35 (2022).

46.     This is the protocol for accounts that are provided for under 11 U.S.C. § 1322(b)(5).

47.     Equifax, Experian, and Trans Union are aware of this protocol.

### *Plaintiff Discovers Inaccurate Information Reporting on His Credit*

48.     On January 25, 2023, Plaintiff obtained a copy of his Experian credit report. On February 1, 2023, Plaintiff obtained copies of his Equifax and Trans Union credit reports.

49.     Plaintiff discovered that Experian was inaccurately reporting several accounts on his January 25, 2023 credit report, including the Pentagon FCU Loan and the SunTrust Mortgage.

50.     Specifically, Experian was reporting the Pentagon FCU Loan as "Discharged through Bankruptcy Chapter 13" and reporting the SunTrust Mortgage as "Petition for Chapter 13 Bankruptcy." For both the Pentagon FCU Loan and the SunTrust Mortgage, Experian was reporting no balance and no payments made since April of 2018.

51.     Experian's reporting was inaccurate. The Pentagon FCU Loan was not included in Plaintiff's bankruptcy discharge. In addition, Plaintiff had completed his bankruptcy, and the

SunTrust Mortgage was no longer subject to a "Petition for Chapter 13 Bankruptcy." For the Pentagon FCU Loan and the SunTrust Mortgage—both of which had balances—Plaintiff had been making regular payments both during and after and his chapter 13 case.

52.     On Plaintiff's February 1, 2023 credit report, Equifax was reporting the Pentagon FCU Loan as "Included in Chapter 13" with a $0 balance. Equifax's reporting was inaccurate. The Pentagon FCU Loan was not discharged in Plaintiff's bankruptcy and Plaintiff was still making payments on the Pentagon FCU Loan.

53.     Although Plaintiff's February 1, 2023 credit report with Trans Union did accurately show that Plaintiff was current on the Pentagon FCU Loan and making monthly payments, Trans Union was inaccurately reporting the Pentagon FCU Loan with a remark of "Chapter 13 Bankruptcy".

54.     The remark of "Chapter 13 Bankruptcy" caused the Pentagon FCU Loan to be listed under the "Accounts with Adverse Information" section of Plaintiff's Trans Union credit report.

### Plaintiff Disputes the Inaccuracies with The CRAs

55.     On or about February 10, 2023, Plaintiff submitted written disputes via Certified Mail to the CRAs regarding the inaccurate reporting (collectively, the "February 2023 Dispute Letters"). In his February 2023 Dispute Letter to each CRA, Plaintiff explained that the Pentagon FCU Loan was provided for in his bankruptcy plan under § 1322(b)(5) of the bankruptcy code and therefore should not have been reporting as discharged. Plaintiff also explained in each letter that he had been making ongoing payments on that account, and his credit report should reflect those payments.  Further, in his February 2023 Dispute Letter to Experian, Plaintiff explained that the SunTrust Mortgage account was not discharged in his bankruptcy, should not have any references to bankruptcy, and should be reflecting all his payments.

56.     With each February 2023 Dispute Letter, Plaintiff enclosed a copy of his Virginia Driver's License, a 2022 W-2 showing his social security number, and a copy of his bankruptcy petition.

57.     Plaintiff's February 2023 Dispute Letter to Equifax was delivered on February 15, 2023, and Equifax agent James McKellar picked up Plaintiff's February 2023 Dispute Letter on or about February 15, 2023.

58.     Plaintiff's February 2023 Dispute Letter to Experian was delivered on February 15, 2023, and Experian agent James Swanson picked up Plaintiff's February 2023 Dispute Letter on or about March 3, 2023.

59.     Plaintiff's February 2023 Dispute Letter to Trans Union was delivered on February 15, 2023, and a Trans Union agent picked up Plaintiff's February 2023 Dispute Letter on February 15, 2023.

60.     Plaintiff never received a response from Equifax following his February 2023 Dispute Letter.

61.     Plaintiff never received a response from Experian following his February 2023 Dispute Letter.

62.     Plaintiff never received a response from Trans Union following his February 2023 Dispute Letter.

63.     On or about March 31, 2023, Plaintiff again submitted written disputes via Certified Mail to the CRAs regarding the inaccurate reporting (collectively, the "March 2023 Dispute Letters"). In his March 2023 Dispute Letter to each CRA, Plaintiff again explained that the Pentagon FCU Loan was provided for in his bankruptcy plan under § 1322(b)(5) of the bankruptcy code and therefore should not have been reporting as discharged. Plaintiff also explained in each

letter that he had been making ongoing payments on that account, and his credit report should reflect those payments. Further, in his March 2023 Dispute Letter to Experian, Plaintiff explained that the SunTrust Mortgage account was not discharged in his bankruptcy, should not have any references to bankruptcy, and should be reflecting all his payments.

64.     With each March 2023 Dispute Letter, Plaintiff enclosed a copy of his Virginia Driver's License, a 2022 W-2 showing his social security number, and a copy of his chapter 13 bankruptcy plan.

65.     Plaintiff's March 2023 Dispute Letter to Equifax was delivered on April 9, 2023, and Equifax agent James McKellar picked up Plaintiff's March 2023 Dispute Letter on April 11, 2023.

66.     Plaintiff's March 2023 Dispute Letter to Experian was delivered on Experian on April 8, 2023, and Experian agent James Rawlings picked up Plaintiff's March 2023 Dispute Letter on April 11, 2023.

67.     Plaintiff's March 2023 Dispute Letter to Trans Union was delivered on April 7, 2023, and Trans Union agent Alfredo Hewitt picked up Plaintiff's March 2023 Dispute Letter on April 7, 2023.

68.     Plaintiff did not receive anything from Equifax in response to his March 2023 Dispute Letter.

69.     Plaintiff did not receive anything from Trans Union in response to his March 2023 Dispute Letter.

70.     On or about May 3, 2023, Experian mailed results to Plaintiff in response to his March 2023 Dispute.

71.     Experian's May 3, 2023, dispute results showed that Experian failed to correct the inaccurate information that Plaintiff had disputed in his March 2023 Dispute Letter.

72.     Sometime after Equifax received Plaintiff's March 2023 Dispute Letter, Equifax began reporting the Pentagon FCU Loan with a status of "Unavailable".

73.     On or about June 9, 2023, Plaintiff submitted a third set of written disputes via Certified Mail to the Experian and Trans Union regarding the inaccurate reporting (collectively, the "June 2023 Dispute Letters"). In his June 2023 Dispute Letters to Experian and Trans Union, Plaintiff explained for a final time that the Pentagon FCU Loan was provided for in his bankruptcy plan under § 1322(b)(5) of the bankruptcy code and therefore should not have been reporting as discharged. Plaintiff explained again in each letter that he had been making ongoing payments on that account, and his credit report should reflect those payments.  In his June 2023 Dispute Letter to Experian, Plaintiff explained again that the SunTrust Mortgage account was not discharged in his bankruptcy, should not have any references to bankruptcy, and should be reflecting all his payments.

74.     With each June 2023 Dispute Letter, Plaintiff enclosed a copy of his Virginia Driver's License, a 2022 W-2 showing his social security number, a copy of his chapter 13 bankruptcy plan, and monthly statement from Pentagon FCU showing that he was still making payments. Additionally, with his dispute letter to Experian, Plaintiff also enclosed a monthly statement from Truist (formerly SunTrust Mortgage) to demonstrate the status of his mortgage.

75.     Plaintiff's June 2023 Dispute Letter to Experian was delivered on June 12, 2023, and Experian agent Lance Rawlings picked up Plaintiff's June 2023 Dispute Letter on June 14, 2023.

76.     Plaintiff's June 2023 Dispute Letter to Trans Union was delivered on June 12, 2023, and was picked up by Trans Union agent Alfredo Hewitt.

77.     Plaintiff never received a response from Experian following his June 2023 Dispute Letter.

78.     Plaintiff never received a response from Trans Union following his June 2023 Dispute Letter.

79.     Out of eight dispute letters that he sent to the CRAs via certified mail, return receipt requested, Plaintiff only received a response to one. The sole response was from Experian, who failed to correct the inaccurate information that Plaintiff disputed.

80.     As of April 2024, Experian was still inaccurately reporting the Pentagon FCU Loan with an inaccurate and derogatory status of Discharged through Bankruptcy Chapter 13 and still reporting the account the SunTrust Mortgage (now Truist Mortgage) with an inaccurate and derogatory status of "Petition for Chapter 13 Bankruptcy."

81.     As of April 2024, Trans Union was still inaccurately reporting comments of "Chap. 13 wage earner plan account" on the Pentagon FCU Loan tradeline.

82.     To lower their costs, Defendants intentionally choose not to comply with the FCRA. Accordingly, Defendants' violations of the FCRA were willful.

### The CRAs Did Not and Do Not
### Conduct Any Investigation of Most Consumer Disputes

83.     Unknown to the Plaintiff until this lawsuit, it has long been the practice of Equifax, Experian, and Trans Union to refuse to perform the statutorily mandated FCRA investigation and instead delegate all action in response to consumer disputes to a third-party outsource vendors located overseas. Equifax and Trans Union use a vendor, previously known as Intelenet Global Services and now as Teleperformance.

84.     Experian uses a sister company, Experian Chile (or Experian Costa Rica) to process its mail disputes.[2]

85.     For Equifax, a third-party document processing company in Atlanta maintains several Post Office boxes for receiving consumer mail to Equifax such as disputes, requests for a credit file disclosure, and other communications. That mailbox company receives consumer disputes and scans them into batches with other disputes. Equifax then forwards the dispute mail batches to the same third-party, Teleperformance, based in Mumbai, India.

86.     Trans Union, on the other hand, receives and scans the mail into batches directly out of its facility in Eastern Pennsylvania before forwarding the batches to Teleperformance.

87.     Both Teleperformance and the Experian affiliate use low-wage employees to work quickly to process the consumer dispute letters they receive. They skim the letters and select one of a handful of codes from a dropdown menu to best describe the consumer's detailed dispute information in 2 digits. For example, the most common relevant code is: "01 Not his/her."

88.     Teleperformance agents and Experian Chile are not allowed to do any of the following things: contact the consumer, use the telephone or e-mail to investigate, research, contact the furnisher directly, or take longer than 5 minutes per dispute.

---

[2] Defendant Experian took a different route, outsourcing its dispute procedures to an affiliated company, Experian Services Chile, S.A, in Santiago, Chile. Experian long ago lost the argument that testimony from these dispute agents requires more than a garden-variety Rule 30 notice. *Calderon v. Experian Info. Sols., Inc.*, 290 F.R.D. 508, 510 (D. Idaho 2013). Such was confirmed in a recent case in the Eastern District of Virginia with Plaintiff's Counsel opposing, wherein Experian produced its Chilean dispute investigator for remote deposition through a Rule 30(b)(1) notice without opposition. *Sublett v. Nissan of Richmond, LLC, et al.*, No. 3:20-cv-156 (E.D. Va.). To the extent Experian would argue here that it cannot produce its Chilean dispute agents pursuant to a Rule 30 notice, then Plaintiff will pursue his 1681i failure-to-investigate claim on the same theory—no investigation was conducted by the CRA—as Plaintiff alleges against Equifax for its farming-out investigations to Teleperformance.

89.     The dispute processing agents are not hired to perform actual FCRA investigations. Instead, the agent's sole responsibility is to read consumer dispute letters, select one of a handful of common dispute codes from a drop-down menu, and then click that code.

90.     In fact, all three credit reporting agencies strongly encourage consumers to make disputes through their online websites. When consumers do so, the consumer has to click one of just a few available dispute reasons (such as "The balance and/or past due amount are/is incorrect?). The online dispute then is outputted into the "e-Oscar" system described below without ever touching human hands or being read by human eyes at Equifax, Trans Union and Experian. It gets sent to Defendants' creditor customers (such as Pentagon FCU and SunTrust Mortgage) for their sole review and consideration.

91.     The CRAs believe that they cannot direct, control, manage or reliably influence the employees of their respective third-party outsource vendors.

92.     Both Equifax and Trans Union have taken the position in other litigation that it has no control over Teleperformance. For example, under oath before another court, Equifax's representative employee testified: "Intelenet has no corporate affiliation with Equifax. Intelenet is not a corporate partner of Equifax. Rather, Intelenet is a company wholly separate from Equifax and is a party to a contract with Equifax wherein Equifax hired Intelenet to assist Equifax with various matters. Neither Mr. Negi nor Mr. Singh [the dispute processing agents] are employees of Equifax." *Miller v. Equifax Info. Serv.*, Case No. 4:19-cv-584, ECF 47-1 (M.D. Fla. Sept. 18, 2020). And in its briefing in that same case, Equifax argued, "Courts have determined that Intelenet is a separate legal entity, not controlled by a party."

93.     Trans Union has taken and succeeded with this same position. *See, e.g., Wilcox v. Servis One, Inc.*, No. 1:19-cv-02545-RDB (D. Md.), ECF 71 (ruling that Trans Union did not have control or the ability to produce for deposition Indian employees of Intelenet).

94.     Equifax, Trans Union and Experian themselves did not conduct any reinvestigation of Plaintiff's many disputes. Instead, they merely caused them to be removed from their control to be saved within a database by an overseas data-processing vendor.

### *Plaintiff Suffered (and Continues to Suffer) Actual Harm*

95.     Experian, and Trans Union continue to derogatory information on Plaintiff's credit report, despite being notified multiple times of the inaccuracies.

96.     Plaintiff has been attempting to resolve these matters with Defendants, and Plaintiff's ability to rebuild his credit was significantly hindered by Defendants' delays and failures to correct the inaccurate reporting.

97.     As a result of the derogatory of the inaccurate credit reporting, Plaintiff has suffered damages, including, but not limited to:

    a.      Stress associated with not being unable to correct the errors to have the fraudulent account removed from his credit file;

    b.      Monies lost by attempting to fix his credit, e.g., communication costs, postage for disputes;

    c.      Loss of time attempting to cure the error;

    d.      Mental anguish, stress, aggravation, and other related impairments to the enjoyment of life.

    e.      Stress associated with attempting to resolve this matter.

    f.      Fear of embarrassment and reluctance to apply for credit.

g.     Loss of privacy and harm to his reputation.

98.     Specifically, Plaintiff's aggravation damages have included (but are not limited to) anxiety, chest tightness, high blood pressure, feelings of fear, humiliation, embarrassment, irritability, and insomnia.

### *Defendants' Conduct Was Willful*

99.     The FCRA allows for a remedy for a "willful" violation. A willful act or violation includes, "not only knowing violations of [the statute], but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, at 57 (2007). A "reckless" action includes conduct whereby "the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id*. at 69.

100.     Proof of willfulness includes, for example, "evidence that other consumers have lodged complaints similar to" the one made by the Plaintiff and a failure to make the correction right away. *Dalton*, 257 F.3d at 418; *Saunders v. Branch Banking & Trust Co. of Va*., 526 F.3d 142, 151 (4th Cir. 2008).

101.     As detailed above, the FCRA section at issue here, and informative guidance, have been around now for over 50 years. The language of § 1681e(b) has not changed. Equifax, Experian, and Trans Union's dispute investigation obligations under § 1681i(a) have not changed. The FCRA's caution of Defendants' "grave responsibilities" to ensure accuracy has not changed.

102.     Equifax, Experian, and Trans Union have received thousands of disputes and other complaints regarding the creditors at issue in this case—an amount sufficient to require a reasonable company to at least examine or investigate further before blindly accepting further reporting.

103.     Just in federal court alone, during the past decade the creditor-furnishers disputed by Plaintiff have had to defend 170 consumer credit lawsuits altogether (of those, Pentagon Federal

Credit Union has had to defend approximately 55, 32 were filed against SunTrust Mortgage, and 83 were filed against SunTrust Bank.).

104.    In many or even most of these FCRA lawsuits brought by a consumer, one or more of the CRA Defendants was a named co-defendant.

105.    Equifax, Experian, and Trans Union knew or should have known of this litigation history. They use and have access to PACER to investigate and monitor consumer complaints.

106.    The CFPB has maintained a Consumer Complaint database since 2017. It receives a small percentage of the total consumer credit reporting complaints made nationwide, as many multiples more are made directly to the Defendants, and/or to other government agencies, attorneys, or non-profit organizations.

107.    Each Defendant regularly receives unredacted consumer dispute details from this database.

108.    Since the database began accepting complaints in 2017, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Equifax.

109.    Since the database began accepting complaints in 2017, the CRPB has sent hundreds of thousands of consumer reporting complaints to Experian.

110.    Since the database began accepting complaints in 2017, the CRPB has sent hundreds of thousands of consumer reporting complaints to Trans Union.

111.    Further, over 190,000 of the CFPB complaints as to Equifax were based largely on their failure to reasonably investigate consumer disputes.

112.    Over 150,000 complaints as to Experian were based largely on their failure to reasonably investigate consumer disputes.

113.    Over 160,000 complaints of the CFPB complaints as to Trans Union were largely based on their failure to reasonably investigate consumer disputes.

114.    Just in the last 12 months alone, Equifax, Experian, and Trans Union have each been sued by consumers alleging their violation of the FCRA over 2,000 times. Most of these alleged that Equifax and Experian violated § 1681i(a) by failing to conduct a lawful reinvestigation of the consumer's accuracy dispute. This complaint history has been true for nearly every year over the last decade.

115.    While the thousands of consumer complaints and hundreds of thousands of consumer disputes alone would have put the CRA Defendants on notice of the failures of their dispute investigation procedures in ensuring accuracy, numerous Federal District and Circuit Courts have placed the CRA Defendants on notice that they may not merely "parrot" what their creditor- customer tells them if the consumer has provided a substantive and detailed dispute.

116.    Equifax, Trans Union and Experian have had actual notice from numerous other courts that their blind ACDV "parroting" was unlawful. *See, e.g., Centuori v. Experian Info. Sols., Inc.*, 431 F. Supp. 2d 1002, 1008 (D. Ariz. 2006) ("'The grave responsibility imposed by [the FCRA] must consist of something more than merely parroting information received from other sources.'"); *Schweitzer v. Equifax Info. Sols. LLC*, 441 F. App'x 896, 904 (3d Cir. 2011); *Pourfard v. Equifax Info. Sols. LLC*, 2010 WL 55446 (D. Or. Jan. 7, 2010) ("[T]he caselaw is clear that a reporting agency does not act reasonably under the FCRA by deferring entirely to another source of information."); *Bradshaw v. BAC Home Loans Servicing, LP*, 816 F. Supp. 2d 1066, 1073-74 (D. Or. 2011)("[Equifax] instead utilized an automated dispute system to verify the accuracy of plaintiffs' account. Many courts, including this one, have concluded that where a CRA is affirmatively on notice that information received from a creditor may be suspect, it is unreasonable

as a matter of law for the agency to simply verify the creditor's information through the ACDV process without additional investigation.").

117.   Equifax has even been warned by its home District Court, the Northern District of Georgia, which detailed:

> Equifax argues that the creditor is the party responsible for investigating the dispute, once notified of it by the reporting agency. 15 U.S.C.A. § 1681s-2(b) (1998). According to Equifax, the reporting agency's duty under § 1681i is fulfilled once it forwards the complaint to the creditor, the entity in the best position to undertake an accurate investigation. Under § 1681s-2(b), furnishers of information, such as creditors, have certain duties to investigate consumers' disputes. Yet, this does not end the inquiry, or establish that the reporting agency has no responsibility beyond serving as a conduit for consumers' complaints.
>
> To the contrary, a credit reporting agency does not conduct a reasonable investigation by deferring entirely to another source of information. "In a reinvestigation of the accuracy of credit reports, a credit bureau must bear some responsibility for evaluating the accuracy of information obtained from subscribers." *Stevenson,* 987 F.2d at 293. The FCRA "places the burden of investigation squarely on" the reporting agency. *Id.*; *see also Henson v. CSC Credit Servs.,* 29 F.3d 280, 286-87 (7th Cir. 1994); *Swoager v. Credit Bureau,* 608 F.Supp. 972, 976 (M.D. Fla.1985).

*Sampson v. Equifax Info. Servs., LLC*, No. CIV.A. CV204-187, 2005 WL 2095092, at *5 (S.D. Ga. Aug. 29, 2005).

118.   Defendants have long had specific notice of these requirements. The seminal Circuit Court decision addressing § 1681i(a) and finding that a CRA does not conduct a reasonable reinvestigation of a consumer's substantive dispute if it merely "parrots" its creditor-customer was a Trans Union case. *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997). Defendants' notice was so substantial that another court instructed the jury in a § 1681i(a) trial:

> In assessing the issue of notice to Trans Union, you are instructed that, on several occasions since 1997, decisions of federal courts have informed . . . that the Fair

Credit Reporting Act's Requirement for a reasonable reinvestigation must consist of something more than simply the parroting of information received from other sources and/or that a credit reporting agency does not act reasonably by deferring entirely to another source of information, such as a creditor.

*Mullins v. Equifax Info. Servs., LLC*, CIV. 3:05-cv-888 (E.D. Va. Aug. 27, 2007).

119.    Defendants have also repeatedly been criticized by Federal and state regulators, and consumer groups for the refusal or failure to conduct substantive reinvestigations.

120.    In 2015, a large group of state Attorneys General forced a consent order from Defendants by which they were required to develop procedures necessary to comply with the FCRA. Among the many changes imposed, the AG Settlement mandates that Defendants comply with § 1681i(a).[3]

121.    The AG Settlement also requires Defendants to conduct significant research and data gathering—even creating a "working group" to address these issues—and to develop special procedures to handle disputes in cases like this. Notwithstanding these requirements, Defendants did not meaningfully comply with the AG Settlement in these regards.

122.    Defendants are also aware of substantive and detailed criticism by public interest groups about their automated dispute system. For example, in 2009, the National Consumer Law Center ("NCLC"), the organization that publishes the leading legal treatise in this field, also published a scathing research paper detailing the actual process followed by Defendants when a consumer makes a dispute. That report was updated in 2019. AUTOMATED INJUSTICE REDUX Ten Years after a Key Report, Consumers Are Still Frustrated Trying to Fix Credit Reporting Errors, National Consumer Law Center, February 2019. ("NCLC Report").[4]

---

[3] *Available at* https://www.ohioattorneygeneral.gov/Media/News-Releases/May-2015/Attorney-General-DeWine-Announces-Major-National-s.

[4] *Available at* https://www.nclc.org/images/pdf/credit_reports/automated-injustice-redux.pdf.

123.    The NCLC Report summarized its context:

Ten years ago, the National Consumer Law Center (NCLC) issued Automated Injustice: How a Mechanized Dispute System Frustrates Consumers Seeking to Fix Errors in their Credit Reports, the landmark report on the serious dysfunctions in the American credit reporting system. Since then, the Consumer Financial Protection Bureau (CFPB) began exercising supervision authority over the Big Three credit bureaus (Equifax, Experian and TransUnion), and started the difficult task of compelling them to reform their procedures and practices. A coalition of more than 30 state Attorneys General reached a breakthrough settlement with the credit bureaus in 2015, requiring an array of reforms. Despite these very laudable achievements, the credit bureaus and the companies that supply them with information still have serious problems in ensuring the accuracy of credit reports, affecting millions of American consumers. The dispute process required by the Fair Credit Reporting Act (FCRA) that was intended to fix these problems remains ineffective and biased.

124.    Among many of the Defendants' accuracy failures, the NCLC Report discovered:

- **Insufficient Information Conveyed and Considered in Investigation**. Credit bureaus use the highly automated e-OSCAR system to convey disputes to furnishers, primarily using shorthand two- or three-digit codes, and at most only a line or two of text in a minority of instances. The credit bureaus use the same four or five codes over 80% of the time.
- **Failure to Transmit Information Submitted by the Consumer**. Credit bureaus failed to send supporting documentation submitted by consumers to furnishers, in clear violation of the FCRA.
- **Perfunctory Credit Bureau Investigations**. Credit bureaus limit the role of their employees who handle disputes, or of the foreign workers employed by their offshore vendors, to little more than selecting these two- or three-digit codes. Workers do not examine documents, contact consumers by phone or email, or exercise any form of human discretion in resolving a dispute.
- **Credit Bureaus Always Side with Furnishers**. Credit bureaus are universally biased in favor of furnishers and against consumers in disputes. In a practice known as "parroting," credit bureaus blindly adopted the response of the furnisher without performing any independent review.

NCLC Report at 6.

---

125. Despite the notice and judicial, regulatory and public interest criticism, Equifax, Experian, and Trans Union have refused to change their dispute investigation processes because it would cost them money to do so.

126. Equifax, Experian, and Trans Union's procedures imposed on Plaintiff and similarly situated consumers an unjustifiably and unreasonable risk of harm that could have been mitigated or avoided entirely with just modest imposition.

## CLAIMS FOR RELIEF

### COUNT I:
### VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681e(b)
### (Equifax, Experian, and Trans Union)

127. Plaintiff realleges and incorporates the foregoing paragraphs as if fully set out herein.

128. Defendants Equifax, Experian, and Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit report and credit files they published and maintained concerning Plaintiff.

129. As a result of this conduct, action, and inaction of Equifax, Experian, and Trans Union, Plaintiff suffered actual damages, including but not limited to: loss of credit opportunities, time and money spent attempting to get the inaccuracies fixed, anxiety, chest tightness, high blood pressure, feelings of fear, humiliation, embarrassment, irritability, and insomnia.

130. The violations by Equifax, Experian, and Trans Union were willful, rendering each of the Defendants individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, if Defendants are negligent, Plaintiff is entitled to recover under 15 U.S.C. § 1681o.

131.    Plaintiff is entitled to recover costs and attorneys' fees from Equifax, Experian, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT II:**
**VIOLATIONS OF THE FAIR CREDIT REPORTING ACT**
**15 U.S.C. § 1681i(a)**
**(Equifax, Experian, and Trans Union)**

132.    Plaintiff realleges and incorporates the foregoing paragraphs as if fully set out herein.

133.    Equifax, Experian, and Trans Union violated 15 U.S.C. § 1681i(a)(1) by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information or delete the item from Plaintiff's credit files.

134.    Equifax, Experian, and Trans Union each violated 15 U.S.C. § 1681i(a)(4) by failing to consider all relevant information submitted by Plaintiff.

135.    Equifax, Experian, and Trans Union each violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate information from Plaintiff's credit files or modify the item of information upon a lawful reinvestigation.

136.    After receiving Plaintiff's February 2023 Dispute Letters, Equifax, Experian, and Trans Union violated 15 U.S.C. § 1681i(a)(6) by failing to provide written notice to Plaintiff of the results of a reinvestigation not later than 5 days after the completion of a reinvestigation.

137.    After receiving Plaintiff's March 2023 Dispute Letters, Equifax and Trans Union violated 15 U.S.C. § 1681i(a)(6) by failing to provide written notice to Plaintiff of the results of a reinvestigation not later than 5 days after the completion of a reinvestigation.

138.    After receiving Plaintiff's June 2023 dispute letters, Experian, and Trans Union violated 15 U.S.C. § 1681i(a)(6) by failing to provide written notice to Plaintiff of the results of a reinvestigation not later than 5 days after the completion of a reinvestigation.

139.    As a result of Equifax, Experian, and Trans Union's violations of 15 U.S.C. § 1681i(a), Plaintiff suffered actual damages, including but not limited to: loss of credit opportunities, time and money spent attempting to get the inaccuracies fixed, anxiety, chest tightness, high blood pressure, feelings of fear, humiliation, embarrassment, irritability, and insomnia.

140.    The violations by Equifax, Experian, and Trans Union were willful, rendering each of the Defendants individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Equifax, Experian, and Trans Union were negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o.

141.    Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from Equifax, Experian, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury of all issues triable by jury.

## DEMAND FOR RELIEF

Plaintiff therefore respectfully requests that this Court:

(1)    Award Plaintiff actual and punitive damages for violations of the FCRA by Equifax, Experian, and Trans Union;

(2)    Award Plaintiff attorney's fees and costs under the FCRA;

(3)     Award Plaintiff pre-judgment and post-judgment interest at the legal rate; and

(4)     Award other relief as the Court deems appropriate.

**TRIAL BY JURY IS DEMANDED**.

**May 14, 2024**

                                    Respectfully submitted,

                                    **JAMES R. HALE**

                        By:    /s/ Adam W. Short
                                    Mark C. Leffler, VSB #40712
                                    Adam W. Short, VSB #98844
                                    CONSUMER LITIGATION ASSOCIATES, P.C.
                                    763 J. Clyde Morris Blvd., Ste. 1-A
                                    Newport News, VA 23601
                                    Telephone: (757) 930-3660
                                    Facsimile: (757) 930-3662
                                    Email: mark@clalegal.com
                                    Email: adam@clalegal.com

                                    Emily Connor Kennedy, VSB #83889
                                    CONSUMER LITIGATION ASSOCIATES, P.C.
                                    626 E. Broad St., Suite 300
                                    Richmond, VA 23219
                                    Telephone: (757) 930-3660
                                    Facsimile: (757) 930-3662
                                    Email: emily@clalegal.com

                                    *Counsel for Plaintiff*